## IN THE MATTER OF J. BERNARD ROGOVOY, AN ATTORNEY AT LAW OF NEW JERSEY.

Argued April 6, 1959—Decided June 1, 1959.

*Mr. William T. Hilliard, 3rd* for the order.

*Mr. David L. Horuvitz* for the respondent.

The opinion of the court was delivered by

SCHETTINO, J. The Ethics and Grievance Committee of the Salem County Bar Association received six complaints against J. Bernard Rogovoy, an attorney-at-law of this State (hereinafter referred to as "respondent"). Three of the complaints were filed by Maurice N. Shills, Marjorie Carroll and Roy A. Weiss. Shills' complaint was dismissed on the ground that the evidence did not sustain the allegations of the complaint. No phase of this complaint is before us. The other three were dropped by the committee. Additionally, we directed the committee to investigate and report on the circumstances surrounding the attempted withdrawals of the Carroll and Weiss complaints.

### THE WEISS MATTERS.

The committee, with one member dissenting, found that the evidence did not sustain the Weiss complaint which alleged that respondent breached an understanding concerning the method of payment of the counsel fee. As to the attempted withdrawal of the Weiss complaint, the committee, with one member dissenting, felt that, as the Weiss complaint could not be "formally proven," it could make no charge against respondent. However, the committee stated "In view of Canon 39, the committee is critical of Mr. Rogovoy's conduct * * *." The dissenting member stated:

"There is no doubt in my mind that the defendant was guilty of a violation of Canon 39 in so coercing Mr. and Mrs. Weiss as he did, nor is there any doubt in my mind that the defendant violated the spirit and letter of Canon 12 when he took over the Weiss home in lieu of his $1000 fee for representing Weiss in the criminal matter before the Court in Delaware County, Pennsylvania."

The Weiss complaint alleged that Weiss had engaged respondent for an agreed fee of $1,000 to defend Weiss on two Pennsylvania indictments; that Weiss could not then pay the fee; that at the suggestion of respondent, Mr. and Mrs. Weiss transferred title to their property valued at $4,500 to a straw grantee with the understanding that it would be reconveyed to them upon payment of the $1,000 fee; that the property was conveyed at respondent's direction by the straw grantee to Mrs. Rogovoy without an opportunity being given to Weiss to pay the fee; that thereafter respondent paid off a $500 mortgage and required Weiss to pay rent of $55 a month to him. Weiss testified that he paid $2,800 for the property and that he had made some improvements. The record shows that the property had encumbrances of approximately $3,600 and that its best appraised value was $4,500.

Admittedly, respondent represented Weiss on two indictments in Pennsylvania, personally paid a fine and costs of

over $200 to a Pennsylvania court for Weiss, paid on behalf of Weiss a fee of $325 to Weiss' Pennsylvania counsel, and thus respondent's computed net fee amounted to $475. Respondent denied that there was an agreement to reconvey the property but that Weiss asked him to take over the property, to pay off the obligations encumbering it, and to consider the $1,000 fee paid off by the equity of the property.

We agree with the committee's majority finding that the evidence did not support the Weiss charge of a breach of an alleged agreement concerning the payment of the fee and the reconveyance of the real estate. Moreover, our examination of the testimony supports the committee's conclusion concerning the circumstances surrounding the withdrawal of the Weiss complaint and its view that although there was no unethical conduct, yet respondent's handling of the matter was not free from criticism.

*Canons of Professional Ethics,* 39 provides:

"A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party. In doing so, however, he should scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand."

The testimony is scant. Mrs. Weiss testified that she had received a telephone call from respondent telling her to have her husband come to his office regarding the complaint he had filed against respondent. She understood respondent to say that he wanted her husband to sign a statement that the complaint was not true and that, unless Weiss did so, Weiss would go to jail in Pennsylvania. Weiss testified that he went to respondent's office, talked to him about the complaint, told him that he (Weiss) did not know it was a complaint, did not intend to complain about respondent, and did not want to hurt anyone. He said that respondent asked him to tell the truth; that he then told respondent the truth;

that he had respondent draw an affidavit and thereafter both of them went to the Salem County Clerk's office where Weiss swore to the truth of the affidavit. Weiss emphatically declared that no one forced him to sign this affidavit and that he did it willingly.

Respondent testified that he called the Weiss home, spoke to Mrs. Weiss about back rent and the key to the house, both of which he wanted immediately because he was greatly incensed about the Weiss complaint against him and that if he did not get the rent and key right away, he would sue them. He also testified that when Weiss arrived at his office, he showed him the complaint and Weiss said, "That is not true," and stated he would tell the truth. Respondent reduced to typed affidavit form Weiss' statement and had Weiss sign and acknowledge it before an attorney at the county clerk's office.

We agree with respondent's counsel's statement that respondent's action was not "in particularly good taste." However, we agree with the committee that there was no violation of *Canon* 39. Although we find the charges not proved, we feel that poor judgment was exercised by respondent in personally communicating with the complaining witnesses. The safer course, in order to avoid a charge or an inference of improper pressure or undue stress, would have been for him to retain counsel immediately and let counsel prepare his case and interview the complaining and other witnesses.

In order to avoid any misunderstanding, we here note our policy that complaints cannot be withdrawn without the consent of the Ethics and Grievance Committee.

## THE CARROLL MATTERS.

The Carroll complaint in essence charged respondent with planning a collusive divorce on behalf of his client, James Carroll, with the help of Mrs. Carroll. The committee found respondent guilty of participating in an arrangement

of a collusive divorce action and guilty of bringing improper pressure or undue stress to bear upon Mrs. Carroll to withdraw her complaint, concluding that it also found "unethical or unprofessional conduct on the part of" respondent.

Mrs. Carroll's complaint stated that sometime in July 1957 her husband told her he had gone to see respondent to have him institute divorce proceedings against her and that respondent wanted to see her. She went to respondent's office, discussed the issues, and was told that her husband insisted on adultery as a ground of divorce. She said she agreed to permit the proceedings to be instituted after respondent assured her that everything would be heard in private, that it would receive no publicity and that the issue of custody would not be an issue. Respondent and she talked about the details of the alleged adultery. Respondent suggested that the date could be New Year's Eve, December 31, 1956; that two persons caught her in the act at a motel or a friend's home and that she secure the services of two of her friends to testify. She stated that respondent knew none of this was true. Her complaint contains the following:

> "I did, however, solicit the aid of a married couple, who are very good friends of mine and they were induced by me to agree to bear false witness against me, all of which was done at the advice and suggestion of [respondent], who never informed me that any of this was wrong or unlawful."

By an affidavit dated January 21, 1958 she attempted to withdraw this complaint.

The committee found that the Carroll complaint was substantiated by the evidence, that the act of adultery did not take place on December 31, 1956 as alleged in the divorce complaint. It further found that respondent knew or should have known this, that the defendant and the corroborating witnesses did not know each other on or before December 31, 1956, and that although respondent testified he had obtained the divorce data from his client, actually he had obtained the information from Mrs. Carroll.

■ We are not convinced that the evidence sustains the committee's conclusions. For that reason, we go into detail on the analysis of the testimony. Basically, the determinations are bottomed upon the issue of credibility.

We first consider the charge of a collusive divorce scheme. Mrs. Carroll testified that in the summer of 1957, after her husband told her that he had retained respondent to obtain a divorce for him alleging her adultery with James Robinson, she went to see respondent to discuss the proposed divorce action. She testified that in her desire to obtain a quick divorce with as little publicity as possible, she suggested to respondent the time and place of the act and the names of two witnesses, the Buttons, to the alleged act. However, she testified she told him that the act did not occur at the time and place alleged by respondent and that respondent was told by her that the act never took place. When she was recalled by the committee, she stated that she told respondent that her story of the December 31, 1956 act of adultery was true. On cross examination she admitted that respondent stated he knew of the December 31, 1956 incident before she mentioned it to him. In passing we note that she said she did commit adultery with James Robinson after December 31, 1956, and that she so informed her attorney.

Around the beginning of November 1957 she decided to contest the divorce action because it was based on adultery. She said she was upset by the alleged ground of adultery and also by a letter she had received from her 15-year-old daughter, by Mrs. Carroll's mother's complaints to her that adultery was a terrible charge, and by the fear that the publicity would adversely affect her children. As a result, she became angry at her husband and, she said, the more she thought about it, the angrier she became. She thereafter sought advice from an attorney, Mr. George Friedman, to stop Mr. Carroll from getting a divorce on that ground. She told him of her discussion with respondent and he thereupon drew up the complaint against respondent.

Her testimony before the committee was to the effect this was the only paper she ever signed in Friedman's office and she thought it merely related to her divorce. She stated that she never went back to Friedman's office but did talk to him on the telephone. The committee questioned her about an affidavit she signed on December 2, 1957 attached to a notice of motion prepared by Friedman, and about an answer and counterclaim signed by her and dated January 11, 1958. She acknowledged the signatures as hers but could not recall where or when she had signed them.

As we view her entire testimony on this charge it seems a more likely conclusion that Mrs. Carroll initially sought in her own interest to expedite the divorce action based on a ground she knew to be true, and thereafter, experiencing a change of heart because of her fear of the impact of a charge of adultery, she fabricated the story of collusive participation by respondent not to implicate him in a disciplinary matter, but rather to support her effort to defeat the action.

Friedman testified that in the early part of November 1957 Mrs. Carroll called to discuss the divorce proceedings and told him that the divorce complaint drafted by respondent was not true; that respondent knew it but despite that knowledge he had advised her to get friends of hers—the Buttons—to testify to the alleged act of adultery. Friedman thereupon drafted the complaint and had her execute and acknowledge it before a notary. He stated that on at least two other occasions she had discussed these matters with him; that she was aware of the contents of her affidavit, and that she knew it was a complaint against respondent. Friedman also testified that he merely left it in his office and did not communicate with the Salem County Ethics and Grievance Committee concerning these serious charges.

At the time Friedman had working for him a man named Maurice Shills. At the end of December 1957 Shills left his employ due to an editorial for which, he claimed, respondent was responsible. Shills testified that he had been

called in by Friedman to notarize Mrs. Carroll's affidavit (which is the complaint filed with the committee); that he forgot to return the affidavit to Friedman; that when he moved out of Friedman's office he inadvertently took it with him, and that in January 1958 he mailed it to a member of the committee in a plain envelope without a return address. He stated he did this without consulting Friedman. The affidavit had endorsed on it Friedman's name and address. The committee sent the complaint to Friedman because only the original had been received by it. Friedman then told Shills that as long as the complaint had been sent by Shills, he might just as well send along to the committee the necessary copies. Shills did so.

Shills admitted that he had a great deal of animosity towards respondent; that he knew Friedman and respondent were being considered for appointment to the office of county prosecutor, and that he would do anything to defeat respondent's aspirations for that office. He said he also checked around the county for other possible complaints against respondent, and the six complaints against respondent resulted from Shills' activities.

Friedman's secretary testified that she typed Mrs. Carroll's complaint; that she also typed the Shills and Weiss complaints as well as the complaints of two other people, but that with the exception of the Carroll complaint, all were given to her on yellow pieces of paper by Shills.

Two witnesses were produced by Friedman "for the purpose of corroborating the testimony given by me." They were Mr. and Mrs. Button at whose house the act of adultery was charged to have taken place on December 31, 1956. They denied ever meeting Mrs. Carroll on or prior to that date, but admitted that they did meet her in January or February 1957 and that thereafter they knew Mrs. Carroll and the co-respondent were living together. They stated that Button and the co-respondent had been close friends for many years and that over the years the two men had been members of a dance orchestra. Mrs. Button admitted

that she did see the co-respondent on the evening of December 31, 1956 when he stopped at the Button house to pick up a musical instrument, and that on that occasion Mrs. Carroll might have been in the co-respondent's parked car in front of the Button house. She also testified that subsequently Mrs. Carroll was an overnight guest at her home on several occasions.

She admitted that Friedman had been her attorney for several years and that he asked her to testify before the committee in order to help the committee decide who was telling the truth. She denied she had ever been asked by respondent to testify in the divorce action. She admitted that on one occasion he had telephoned her home, but it was only to ask for Mrs. Carroll and that he did not talk to her about the divorce proceedings. In answer to a question whether Mrs. Carroll discussed with her the divorce proceedings she answered "Yes" and summarized the discussion as follows:

> "Well, there wasn't any conversation about it. She brought this paper [divorce complaint] to me that Mr. Rogovoy had made up for her, stating that the act of adultery had been committed at our house, which was an absolute lie, and I told her that I wouldn't testify to any such charge. That's all there is to it. She said she could get a quiet divorce on those grounds. I said, 'If you could get it without any publicity, so we weren't dragged into it, other then what was on that paper, all right,' but it was a lie."

Mr. Button stated that Carroll had been to see him after the divorce proceedings had been started and after Mrs. Carroll showed Button her copy of the divorce complaint, and that he was not surprised that his home had been mentioned because he was a friend of the alleged co-respondent and also because he had heard that it was a quick way to get a divorce. Generally, he confirmed his wife's testimony.

To sustain this charge we thus have the testimony of an admitted adulteress whose testimony and affidavits are conflicting, the testimony of an attorney who was a rival of respondent for a public office and whose animosity is clear from the record, a procurer of complaints against respondent

whose admitted aim was to destroy respondent, and two friends of the co-respondent who, as indicated from the above quoted paragraph of the complaint, "were induced [by Mrs. Carroll] to agree to bear false witness against her."

Respondent countered the testimony of these witnesses. On direct examination he testified that Carroll came to his office in July 1957 for the purpose of obtaining a divorce, told respondent his wife had committed an act of adultery with James Robinson in Lower Penns Neck Township on December 31, 1956, and had also committed other acts of adultery. The respondent drafted a complaint for divorce on the ground of adultery but did not consider it necessary to set out any act other than the one of December 31. A few weeks later Mrs. Carroll, of her own volition as far as respondent knew, came to see him, told him her husband had informed her about the divorce proceedings and of the grounds of the complaint. She pleaded with him to keep the divorce proceedings as quiet as possible because she did not want them to affect her job or embarrass her before her friends in North Jersey or before her children. Respondent told her he would not seek publicity and suggested she should feel free to go see another lawyer. He also stated Mrs. Carroll admitted many acts of adultery and may have suggested the names of the witnesses to him. Respondent admitted that he had been agreeable to an arrangement for service of Mrs. Carroll at his office on August 3, 1957. He also stated he forgot to serve the alleged co-respondent and ascertained this only when he sent for his order of reference. He claimed this factor explained the delay in the prosecution of the divorce action until November 1957.

Upon recall he testified that he did not know the Buttons; that he did call them once and told either Mr. or Mrs. Button about the divorce proceedings and advised them that he would call them when they were needed; that his purpose was to make a preliminary verification of the facts alleged in the divorce complaint, and that it was before he prepared the complaint and before he spoke to Mrs. Carroll.

Carroll testified that he went to respondent's office to obtain a divorce on the grounds of adultery, told him that he had information that his wife committed adultery on December 31, 1956 in Penns Grove, that he thought James Robinson was the co-respondent, and that he supplied the names of the witnesses, the Buttons, although he only heard their names from other sources. He stated that respondent did not ask him to send Mrs. Carroll in to see him, and also said that she had volunteered to him to be served in respondent's office. He also testified that when Mrs. Carroll told him she was contesting the divorce, she mentioned to him that her lawyer was also interested in getting the job as county prosecutor and she thought her complaint would somehow cause publicity, and that there should be a good battle over the appointment as a result.

From the record we are forced to an inescapable conclusion that at least as of the time of Mrs. Carroll's visit to respondent's office in July 1957, she had been committing adultery with Robinson, and in view of the serious doubts as to her credibility and that of the Buttons we are not satisfied that the proof shows that respondent and Mrs. Carroll collusively and falsely selected December 31, 1956 as a date on which she had committed adultery. Considering the totality of the evidence on this charge, we are not convinced that the respondent is guilty of the charge of participating in an arrangement of a collusive divorce action.

We next consider the committee's finding that respondent was guilty of using improper pressure or undue stress upon Mrs. Carroll in order to get her to withdraw the complaint.

Friedman testified that on January 21, 1958, subsequent to the filing of the Carroll complaint, he spoke to Mrs. Carroll on the telephone and she told him that the respondent had insisted that she appear at his office that evening. He told her not to go. Later that evening Friedman was asked to telephone her, and when he did so she told him that she had gone to respondent's office and that she was not going to continue to contest the divorce action. Her father

then interrupted the telephone conversation and told Friedman that he was employed by the Lower Penns Neck Township; that the mayor and a township committeeman of that municipality had told him to clear up the Rogovoy matter, and that as a consequence he told his daughter to do so. Mrs. Carroll then cut back in on the telephone conversation. She stated that respondent threatened to expose her, that he would tell her employer that she was employed under an assumed name, Robinson, and, because of these fears, she decided to drop the complaint. Mr. Friedman also testified, contrary to her statement to the committee, that he was not dismissed by her as her counsel.

On direct examination Mrs. Carroll testified that she did not realize the complaint prepared by Friedman was against respondent but thought it was a paper pertaining to her divorce proceedings, and that the complaint was not notarized by Shills as she never met him nor had seen him prior to the present hearings. She acknowledged her affidavit of January 21, 1958, in which she withdrew the charges, and stated that she had made it in good faith with a full understanding of what she was doing.

She also stated that on January 20, 1958 she called her parents' home to return a telephone call from her mother. Her mother told her that she had to come home to straighten out the trouble her complaint against respondent had caused. Her father confirmed the so-called trouble and told her to hurry back. On January 21 her father told her to call the respondent and to go see him and she did so. (However, Mrs. Carroll testified at a preliminary committee hearing on March 25, 1958 that respondent had requested her to come to his office in the evening.) She signed the affidavit withdrawing the complaint and thereafter called Friedman to tell him what she had done and that she no longer required his services.

She also testified that at the time of the filing of the complaint she was employed in the northern part of New Jersey but was laid off in February 1958, that her layoff

had nothing to do with the divorce or these proceedings but was due to lack of work, and that other employees were discharged at the same time.

Mrs. Carroll said she had four children, two by a previous marriage and two by her marriage to Mr. Carroll. Her two oldest children are living with her first husband and the two younger ones with Mr. Carroll. With reference to the custody of the Carroll children, she said she was perfectly satisfied with an arrangement she had with Carroll concerning visitation. She expressed a fear that if she had any trouble with her husband, the arrangement would be changed because respondent was his lawyer, that her father told her respondent was head of a juvenile delinquency committee and that he might bar her visits with her children.

Respondent testified that he did not try to intimidate her; that he made no threat with respect to her job or any job that her father may have; that he did not use any political influence to try to get the Carroll complaint withdrawn, and that he never talked to her between the second time she was in his office for the service of the divorce complaint on August 3, 1957 and 9:30 P. M. January 21, 1958. He denied that he sent for Mrs. Carroll in January 1958, or asked anyone else to send for her. He said that on the evening of January 21, 1958, at about 9:00 P. M., he received a telephone message that Mrs. Carroll and her father wanted to see him in his office that evening. They were told to come down to the office at 9:30 or 9:45 P. M., but that respondent's attorney would be present. By 10:00 P. M. all of them (including the alleged co-respondent) were gathered in the office. He said that he specifically told Mrs. Carroll he did not want to discuss the divorce proceedings but would be glad to talk about the complaint she had filed against him. She thereupon admitted that the complaint was not true. Her statements were taken down stenographically and typed up for her to sign. After Mrs. Carroll and respondent's attorney carefully read the affidavit,

she was administered the oath (she said that it was the first time she had taken an oath), swore to the truthfulness of the affidavit, and signed it.

The record indicates that respondent called Mrs. Carroll's place of employment after the complaint was filed and inquired as to the name she was using in her job. He found out that she had told her employer that her mother's name was Florence Carroll and her married name was Mrs. Robinson. He informed the employer that Mrs. Carroll was working under an assumed name. He admitted so notifying the employer, stating, "I am afraid I did, yes. I shouldn't have." He testified that he did this in order to obtain information to be used as the basis of an amended divorce complaint and to protect himself and his client. He vigorously denied that it was for the purpose of intimidating her. Nevertheless, such unwise activities left him open to an inference that he was employing coercive tactics. *Drinker, Legal Ethics,* 153 (1953).

Respondent's then attorney testified that on January 21, 1958 he received a telephone call from the respondent a little before 10:00 P. M., requesting him to come to the latter's office. He arrived shortly and found Mr. and Mrs. Rogovoy, Mrs. Carroll, her father, and James Robinson present and, from their conversation, he gathered they had been there ten minutes or so. He corroborated respondent's story as to the purpose of the meeting, the drawing of the affidavit, and the swearing and signing by Mrs. Carroll. He said he recalled dictating most of it.

Mrs. Carroll's father testified that he first heard about his daughter's complaint from Mr. Carroll, thereafter spoke to his daughter, told her to come home and try to straighten out the trouble she had caused. He said that no official in the township where he was employed had talked to him about this case on behalf of respondent.

The mayor of Lower Penns Neck Township testified that at no time had he ever had any conversation with Mrs. Carroll's father in reference to the charges against respond-

ent and at no time had respondent asked him to discuss the charges with the father.

Again considering the impact of the entire record, we are not convinced that the specific findings that respondent had used improper pressures or undue stress to obtain the withdrawal of the Carroll complaint are sustained.

■ In passing, we comment on Friedman's activities before the committee. He was permitted not only to produce witnesses against respondent, but also to object to questions directed to these witnesses. We are aware of no authority permitting such participation in committee hearings and we disapprove it.

The order to show cause is discharged.

*Not guilty*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.